**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| WEST SERIES OF LOCKTON COMPANIES, LLC, LOCKTON PARTNERS, LLC, and LOCKTON INSURANCE AGENCY, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 23-cv-00705 |
| vs. | ) ) | JURY TRIAL REQUESTED |
| ALLIANT INSURANCE SERVICES, INC., GREGORY D. BARNES, SCOTT CANALES, JAMES R. LAWRENCE, ANDREW MCCLAVE, MARK RACUNAS, and RICHARD A. RODERICK, | ) ) ) ) ) ) | |
| Defendants. | | |

## FOURTH AMENDED COMPLAINT

1.    **Alliant strikes again**.  For almost a decade, Defendant Alliant Insurance Services, Inc. has been an outlaw in the insurance brokerage industry, conducting illegal "raids" of competitors across the country to steal trade secrets, confidential information, and customers. Over four years ago, Lockton, like so many others, was victimized by one of Alliant's unlawful schemes, and was forced to turn to the courts for relief.[1]  A Delaware court enjoined Alliant from improperly inducing certain former Lockton personnel to breach their contracts and unlawfully misappropriate Lockton's confidential information to solicit Lockton customers, calling Alliant's conduct "secretive and underhanded behavior in violation of contractual obligations and legal

---

[1] This Fourth Amended Complaint refers to Lockton Companies, LLC – Pacific Series (the "Pacific Series"), West Series of Lockton Companies, LLC (the "West Series"), Lockton Partners, LLC ("Lockton Partners"), and Lockton Insurance Agency, LLC ("LIA") collectively as Lockton.

1

requirements."[2]  Alliant did not learn its lesson, and instead has continued to unlawfully harm Lockton and others in the industry.  Once again Lockton is forced to file a lawsuit to prevent Alliant from conspiring with some of the highest-ranking members of Lockton's Pacific Series[3] to sabotage Lockton's business operations in violation of those members' long-standing duties and obligations to Lockton.[4]

2.     The present and ongoing raid of Lockton's West Series (formerly the Pacific Series), and the 2019 raid of the Mountain West Series, are not isolated incidents.  These raids are part of a concerted course of action by Alliant (which Alliant refers to as its "leveraged hire strategy")[5] designed and intended wrongfully to steal business from competitors rather than compete through lawful means.  Alliant consistently denies that it engages in these coordinated schemes.  Yet in case after case and jurisdiction after jurisdiction, Alliant's "leveraged hires" misuse confidential information to solicit clients and colleagues, resign en masse at a time designed to inflict maximum damage on the competitor's business, and flagrantly violate their restrictive covenants and fiduciary duties.  This is not coincidence.  Alliant is the common thread (or as one court recently termed it, the "puppet master"), driving this tortious conduct across the country.

3.     **Defendants Barnes, Canales, Lawrence, McClave, Racunas, and Roderick— at Alliant's direction—betray their own company and colleagues.**  On October 3, 2023, after

---

[2] *Mt. West Series of Lockton Companies, LLC v. Alliant Ins. Services, Inc.*, 2019 WL 2536104, at *22 (Del. Ch. June 20, 2019).

[3] Lockton's operating entity is organized as a series LLC.  It has various series entities organized geographically across the country, including, prior to 2025, the Pacific Series.  Effective December 31, 2024, the Pacific Series contributed all of its assets to the Mountain West Series of Lockton Companies, LLC (the "Mountain West Series"), the Mountain West Series assumed all of the liabilities of the Pacific Series, and the Pacific Series was dissolved.  The producer members of each series hold an equity interest in that series.  Lockton Partners is a nationwide organization comprised of the highest performing producer members from each of the regional series.

[4] *See* The Insurer, *Alliant Raids Lockton for SoCal team including Rich Roderick and Greg Barnes*, Oct. 4, 2023 (reporting Canales' exit).

[5] On information and belief, Alliant recently began referring to the leveraged hire strategy as its "lateral hire strategy" in an effort to conceal its unlawful conduct.

2

months of deception and manipulation, and instead of reporting to Lockton's annual Global Growth Forum (an annual meeting of Lockton's worldwide leadership and sales teams) as expected, Defendants Greg Barnes, Scott Canales, Mark Racunas, and Richard Roderick—in an obviously coordinated and self-serving effort—abruptly notified Lockton that they were terminating their membership interests, "effective immediately." On information and belief, each commenced full-time employment with Alliant the same day. By doing so, they ignored the mandatory 30-day notice provisions of their producer member and/or partner agreements, which are necessary for an orderly transition and winding up of their ownership interests, and breached various contractual and fiduciary obligations to Lockton by accepting full-time employment with Alliant while they were still Lockton producer members and producer partners. Barnes, Canales, Racunas, and Roderick elected to give notice on a day on which they knew Lockton's executive leadership team and producer members were otherwise unavailable for the entire week. Lawrence and McClave followed the same path, Lawrence on April 9, 2024 and McClave on May 28, 2024, each joining Barnes, Canales, Racunas, and Roderick at Alliant, effective immediately. Barnes, Canales, Lawrence, McClave, Racunas, and Roderick will be collectively referred to herein as the "Individual Defendants."

4. The Individual Defendants were not shy about their concerted breach. Roderick alerted the public through multiple posts on LinkedIn, including the following:



Richard A. Roderick · 2nd      + Follow      ···
Managing Director & EVP Alliant
Specialty | Private Equity Sponso...
**Book an appointment**
3mo · Edited · 🌐

Adding yet another proven SPECIALIST to our
production TEAM! Portland, OR-based Auto Dealership
expert Andrew McClave will further enhance our roster
🚗 and continue the reshaping of the brokerage
landscape in the West; at Alliant— we call it "Tuesday"!

#NewSpecialtyTeamMember #AutoIndustryExpert
#AlliantLeadership





Richard A. Roderick · 2nd      + Follow      ···
Managing Director & EVP Alliant
Specialty | Private Equity Sponso...
**Book an appointment**
3mo · 🌐

YKIYK... Getting the A-TEAM back together (and missing
the ones not with us).



[From left to right: Andrew Neporent, Mark Racunas, Greg Barnes, Scott Canales, Andrew McClave, Rich Roderick, and Ken Ren. All of these individuals are former Lockton personnel.]

4

5.     **The Individual Defendants—at Alliant's direction—breached their duties to Lockton and their co-owners.**  The Individual Defendants are not employees of Lockton.  They are owners, Producer Members, and Producer Partners at the highest levels of the organization; they have reaped the benefits of said ownership including by achieving considerable personal wealth.  In addition to the personal benefits, in their positions as owners, Producer Members, and Producer Partners, they have been entitled to and entrusted with access to Lockton's resources, clients, and most sensitive competitive information.  With this access comes unconditional fiduciary duties of loyalty and care they owe to Lockton—duties they have chosen to disregard.

6.     **The Individual Defendants—at Alliant's direction—breached their contracts with Lockton.**  Despite their promises in multiple agreements, the Individual Defendants failed to provide the required 30 days' notice of termination that Producer Members must provide under their member agreements with Lockton and instead immediately joined Alliant.  Since then, the Individual Defendants and Alliant have made it clear they have no intention that the Individual Defendants will honor any of their duties or obligations to Lockton.  Rather, facts have already emerged that make it clear the Individual Defendants' breaches were the result of a pre-planned and highly coordinated effort.  For example, in the weeks leading up to his termination of his membership interest, but while he was still a member and partner in various Lockton entities, Defendant Canales took Lockton clients on a fishing trip where he loudly and repeatedly broadcast his intent to leave Lockton and violate his restrictive covenants. Defendant Canales e-mailed his entire client list to his daughter's e-mail address less than three weeks before he began employment with Alliant, under the guise of sending his annual holiday cards early (the same pretextual justification used by another former Lockton producer who left Lockton for Alliant last year).  At least one of Defendant Canales's customers at Lockton was told of Canales's departure before he

5

left and knew he "was keeping the same phone number."  Defendant Barnes sent copies to his personal e-mail address of sensitive and confidential client trackers under the pretext of needing hard copies because of storms in California ***and then attempted to cover his tracks by deleting those e-mails from his Lockton e-mail account***.  And Lawrence, on information and belief, has solicited at least 15 Lockton clients to Alliant both before and since he purported to terminate his membership, but while he was continuing to receive profits from that same membership interest. Several of the Individual Defendants also were actively soliciting each other for months before they departed:  Roderick attempted to recruit Canales to join Alliant in *April*, nearly six months before they departed together, and Racunas sent a copy of his Alliant offer letter and Alliant employment agreement to Roderick more than two months before their coordinated departures.

7.     But the Individual Defendants did not stop there.  Working hand-in-glove with and at the direction of Alliant while affiliated with Lockton, the Individual Defendants also solicited more than 20 Lockton associates to resign from Lockton and follow them to Alliant.  All told, Alliant's raid of the Pacific Series has resulted in the departures of about three dozen former Lockton personnel, making it a textbook example of Alliant's so-called "leveraged hire strategy" through which Alliant seeks to grow its business through unlawful raids and misappropriation of its competitors' trade secrets and confidential information.

8.     Lockton brings this action against the Individual Defendants to protect its Confidential Information, trade secrets, and business relationships; to enforce the contractual obligations the Individual Defendants undertook as Producer Members and part-owners of Lockton's business, including a thirty-day notice of termination requirement and non-disclosure and non-solicitation obligations; and to prevent Defendants from misusing Lockton's Confidential

Information and trade secrets to compete unfairly; and to enjoin Defendants' ongoing violations of same.

9. **The Individual Defendants have refused to engage or cooperate with Lockton**. Upon receiving notice of the Individual Defendants' intent to terminate their membership interests, Lockton immediately reminded them of their 30-day notice obligation as Producer Members and their continuing contractual obligations and fiduciary duties and requested that they comply with the same, so that Lockton may appropriately wind down their ownership interest. The Individual Defendants refused to provide the requested confirmations.

10. **The Individual Defendants—at Alliant's direction—are misusing Lockton's valuable Confidential Information, have made knowing misrepresentations, and are tortiously interfering with Lockton's relationships to benefit themselves and Alliant.** The Individual Defendants have violated their contractual and fiduciary duties to Lockton by attempting to effectuate the early termination of their membership in Lockton, starting work for Alliant while still Lockton Producer Members (Barnes, Canales, Lawrence, McClave, Racunas, and Roderick) and Producer Partners (Barnes, Canales, Lawrence, and Roderick), and—in Roderick's case—repeatedly making false and misleading misstatements to Lockton about his intention to leave Lockton to join Alliant.

11. Following his departure from Lockton, Barnes has been actively reaching out to Lockton Associates, including through LinkedIn, and using Lockton's Confidential Information to solicit them; has also assisted Alliant by identifying which Lockton Associates and Producers should be contacted and how to contact them; and has even gone so far as to join calls between Alliant and Lockton Associates. Barnes has admitted to communicating with over 20 Lockton customers since his departure from Lockton. On information and belief, he solicited each of these

customers to transfer their business to Alliant either directly or indirectly both before and after he purported to terminate his membership. Moreover, he even admitted that he participated in the solicitation of one Lockton customer by encouraging one of his Alliant colleagues to contact that customer about moving its business. On information and belief, Barnes has misappropriated Lockton's Confidential Information for use at Alliant with the intent to solicit, or attempt to solicit, Lockton customers and compete unfairly against Lockton.

12.     Canales similarly admitted to communicating with nearly 20 Lockton customers following his departure from Lockton and facilitating conversations between those customers and Alliant. Many of these improper communications were carried out by the former Lockton personnel hired by Alliant as part of the raid. Canales further admitted that he continued to service over a dozen former Lockton customers on behalf of Alliant, and, on information and belief, either directly or indirectly solicited customers before he purported to terminate his membership. On information and belief, Canales has misappropriated Lockton's Confidential Information for use at Alliant with the intent to solicit, or attempt to solicit, Lockton customers and compete unfairly against Lockton.

13.     Roderick also admitted to communicating with a dozen Lockton customers since his departure from Lockton. On information and belief, he solicited each of these customers to transfer their business to Alliant, and either directly or indirectly solicited customers both before and after he purported to terminate his membership. Moreover, even after a sham remediation process, Roderick admitted to possessing Lockton Confidential Information, namely, two Microsoft Excel spreadsheets containing names, job titles, and work locations of Lockton personnel. On information and belief, Roderick has misappropriated Lockton's Confidential

Information for use at Alliant with the intent to solicit, or attempt to solicit, Lockton customers and compete unfairly against Lockton.

14.     Racunas also admitted to communicating with ten Lockton customers since his departure from Lockton. On information and belief, he solicited each of these customers to transfer their business to Alliant either directly or indirectly before and after he purported to terminate his membership, and, further, he has misappropriated Lockton's Confidential Information for use at Alliant with the intent to solicit, or attempt to solicit, Lockton customers and compete unfairly against Lockton.

15.     And on information and belief, Lawrence and McClave have solicited, or attempted to solicit, Lockton customers and personnel and compete unfairly against Lockton.  Also on information and belief, Lawrence solicited at least 15 Lockton customers to switch their service from Lockton to Alliant while he was still a member of Lockton and in the time after he purported to terminate his membership, while McClave solicited at least seven Lockton customers to switch their service from Lockton to Alliant while he was still a member of Lockton and in the time after he purported to terminate his membership.

16.     **The Individual Defendants' disloyalty—aided, abetted, encouraged, and indeed, demanded by Alliant—must be stopped.**  Lockton seeks, among other remedies, injunctive relief prohibiting the Individual Defendants from (i) maintaining, possessing, using, disclosing, or providing to any third party Lockton's Confidential Information; (ii) continuing to violate their fiduciary and contractual obligations to Lockton while maintaining an ownership interest in Lockton as Producer Members (Barnes, Canales, Lawrence, McClave, Racunas, and Roderick) and Producer Partners (Barnes, Canales, Lawrence, and Roderick); (iii) soliciting, accepting, or servicing Lockton's restricted customer accounts, or from wrongfully aiding and/or

9

abetting these activities, until these restrictions end per their contractual agreements; (iv) wrongfully disclosing, using, or taking Lockton's Confidential Information and trade secrets, including, but not limited to, information about Lockton's customer accounts, to solicit or render services to customer accounts, or from wrongfully aiding and/or abetting these activities; and (v) interfering with Lockton's contracts and business expectancies, as further alleged herein. Lockton also seeks injunctive relief prohibiting (i) Alliant from tortiously interfering with any Lockton producer member's member or partnership agreements with Lockton or aiding and abetting their breaches of their fiduciary duties, including the duty of loyalty and (ii) Alliant and anyone acting in concert with it or on its behalf from using any Lockton Confidential Information. Lockton also seeks injunctive relief ordering that Defendants (1) account for all Lockton's Confidential Information that Defendants misappropriated; (2) return to Lockton all of Lockton's Confidential Information in their possession, custody, and control; (3) certify in writing and under the pains of penalties of perjury, after returning Lockton's Confidential Information, that all paper and electronic copies of all Lockton's Confidential Information in their possession, custody, or control has been returned and, if electronic, upon resolution of these proceedings, has been permanently deleted pursuant to an agreed upon or court-approved forensic protocol from any location where they have been stored; (4) provide an accounting for any products, plans, services, contracts, or other materials that involve or rely on any of Lockton's Confidential Information and for any business obtained by Defendants as a consequence of their unlawful actions. Lockton also seeks a declaration of the parties' rights and obligations under their agreements and seeks to recover damages for those quantifiable injuries that Lockton has suffered to date.

## THE PARTIES

17.     The West Series is a series of Lockton Companies, LLC (the "Company"), a Missouri series limited liability company organized under the Missouri Limited Liability Company Act, Mo. Rev. Stat. §§ 347.010, *et seq.*, specifically Mo. Rev. Stat. § 347.186.  At all times that the Individual Defendants were Lockton producer members, they were producer members of the Pacific Series.  Effective December 31, 2024, the Pacific Series contributed all of its assets to the Mountain West Series, the Mountain West Series assumed all of the liabilities of the Pacific Series, and the Pacific Series was dissolved.  Subsequently, the Mountain West Series changed its name to the West Series.  The West Series operates brokerage offices and transacts business in California (Irvine, Los Angeles, Sacramento, San Diego, San Francisco, San Jose, and Sonoma), Washington, Colorado, Nevada, Arizona, and Oregon, among other locations.

18.     Lockton Partners is a Missouri Limited Liability Company organized and operating under the laws of the State of Missouri.  Lockton Partners ultimately holds the operating interests in all Lockton entities that carry on insurance intermediary business on a global basis.

19.     Lockton Insurance Agency, LLC ("LIA") is a Missouri Limited Liability Company organized and operating under the laws of the State of Missouri.  LIA is the Corporate Member of each Series of the Company.

20.     Defendant Alliant is a corporation organized and existing under the laws of the State of California,[6] with its principal place of business in Newport Beach, California.  Alliant is a direct competitor to Lockton in the insurance brokerage market.

---

[6] Until January 2020, Alliant was a Delaware corporation.  However, after the Delaware Chancery Court issued a scathing opinion detailing Alliant's unlawful conduct, *see* Paragraphs 110-114, *infra*, Alliant fled the jurisdiction, reincorporating in California.

11

21.     The Individual Defendants are residents of California and commercial insurance brokerage professionals.  Barnes was an owner and Producer Member of the Pacific Series and an owner and Producer Partner of Lockton Partners.  Canales was an owner and Producer Member of the Pacific Series and an owner and Producer Partner of Lockton Partners.  Lawrence was an owner and Producer Member of the Pacific Series and an owner and Producer Partner of Lockton Partners.  McClave was an owner and Producer Member of the Pacific Series.  Racunas was an owner and Producer Member of the Pacific Series.  Roderick was an owner and Producer Members of the Pacific Series and an owner and Producer Partner of Lockton Partners.

## JURISDICTION AND VENUE

22.     This action arises under federal law, including the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, as well as under Missouri law.  The Court has subject-matter jurisdiction over Lockton's federal claims under 28 U.S.C. § 1331 and over the DTSA claim under 18 U.S.C. § 1836(c).  The Court has supplemental jurisdiction over the remaining causes of action under 28 U.S.C. § 1367.

23.     By signing and accepting the terms of their respective binding agreements, not to mention the benefits attendant thereto, the Individual Defendants expressly agreed with Lockton that jurisdiction is proper in this Court, and they are therefore subject to the Court's jurisdiction. There is a reasonable basis for the parties' choice of forum given the negotiation of the agreements in Missouri, Lockton's substantial contacts with Missouri, and the motivation to resolve disputes regarding the parties' rights and interests in the agreements on a uniform basis in accordance with Missouri's series limited liability company law.  Additionally, Lockton, and thus McClave and Racunas as Producer Members and Barnes, Canales, Lawrence, and Roderick, as Producer Members and Producer Partners of Lockton, receive administrative, regulatory/compliance, and

customer-related support and information from Missouri, and utilize computer servers located in Missouri.

24.     Venue is proper in this Court because the Individual Defendants expressly agreed in writing that any action relating to their respective written agreements with Lockton must be brought exclusively in either state court or federal court in Jackson County, Missouri.  Venue is thus proper in this Court as to all of Lockton's claims against all Defendants because those claims arise out of the same nucleus of operative facts as Lockton's contract-based claims against the Individual Defendants.  Therefore, judicial economy, fairness, and convenience require the claims be heard in one proceeding before this Court. Venue is also proper in this Court because a substantial part of the events or omissions giving rise to Lockton's claims occurred here, and a substantial part of property that is the subject of this action is situated here: the Individual Defendants' misrepresentations and omissions were directed at and received by individuals in this venue, the limited liability companies of which they were part-owners are based here, and the harm their actions caused—which Alliant directed and induced—occurred to entities based here.

25.     Alliant is subject to personal jurisdiction in this Court because this action arises out of and relates to Alliant's minimum contacts with the State of Missouri and its purposeful availment of the privilege of doing business in this forum.  Alliant has two offices in Missouri out of which it conducts its business.  On information and belief, that business includes (but is not limited to) soliciting new hires in Missouri, recruiting insurance professionals employed by competing insurance brokers in Missouri, soliciting customers in Missouri, and hiring insurance professionals away from other firms in Missouri.  In addition, Alliant has engaged in conduct in other states (including in California) that was intentionally targeted and directed specifically toward the State of Missouri, that Alliant intended to have effects, including causing competitive

13

harm to its competitors, in the State of Missouri, and that has caused actual and foreseeable harm (including competitive and economic injuries) in the State of Missouri. Indeed, the aim of Alliant's repeated raids on Lockton and the producers who are members of its various Missouri-based series LLCs is to decimate Lockton as a competitor. Each of the six Individual Defendants holds an insurance producer license issued by the State of Missouri, which signifies that they conduct business in the State of Missouri. Through the wrongful conduct that forms the basis of this action, Alliant solicited and induced those Missouri-licensed producers to accept employment with Alliant, where Alliant intends to encourage and incentivize them to conduct business in the State of Missouri on Alliant's behalf.

## FACTUAL ALLEGATIONS

### I.      THE WEST SERIES

26.     The West Series, along with the other series of the Company and its affiliates, makes up one of the world's preeminent insurance brokerage firms, offering insurance, risk management, employee benefits, and retirement services, across a number of economic sectors, including the real estate and construction, technology, telecommunications, healthcare, and financial services sectors. The West Series and its affiliates operate globally, through a number of affiliates.

27.     On May 1, 2016, the Company reorganized with the approval of the Pacific Series Producer Members, including the Individual Defendants. Each Producer Member of the Pacific Series entered into an individual member agreement with the Pacific Series and thereby agreed, along with all Producer Members of the Other Series, to be bound by the "Second Amended and Restated Operating Agreement of Lockton Companies, LLC and each of its Series," dated May 1, 2016, which applies to the Company, all of its series, and all Producer Members.

14

28.     On January 1, 2018, the Company amended and restated its operating agreement to clarify minor ambiguities by executing the Third Amended and Restated Operating Agreement of Lockton Companies, LLC and Each of its Series (the "Pacific Series Operating Agreement"). Due to the nature of the amendment, approval of each Pacific Series Producer Member was not required. Each Producer Member of the Pacific Series, along with all Producer Members of the other series, are bound by the Pacific Series Operating Agreement, which applies to the Company, all of its series, and all Producer Members.

29.     Each Producer Member of the Pacific Series held an ownership interest in the Pacific Series. Specifically, each Producer Member of each series makes a Capital Contribution (as defined in the Member Agreement) to and thereby purchases and owns one Producer Unit of the respective series with which he or she is affiliated, which confers and represents the Producer Member's equity ownership interest in the respective series with which he or she is affiliated and entitles the Producer Member to receive, among other benefits of ownership, producer profit return (profit distribution) from his or her series and a Buy-Sell Price upon termination of his or her membership.

30.     Effective December 31, 2024, as part of a strategic combination of operations to enhance capabilities and service offerings for the benefit of associates and clients, the Pacific Series contributed all of its assets to the Mountain West Series, the Mountain West Series assumed all of the liabilities of the Pacific Series, and the Pacific Series was dissolved. Subsequently, the Mountain West Series changed its name to the West Series.

31.     In addition to its organization as a Missouri series limited liability company, the West Series has numerous connections to Missouri in its day-to-day operations. The West Series has many associates/employees and Producer Members who are licensed as insurance brokers in

the State of Missouri. The West Series and its Producer Members also pay entity and individual taxes and licensing fees to the State of Missouri.

## II.  LOCKTON PARTNERS

32.  Lockton Partners was formed under the Missouri Limited Liability Company Act, Mo. Rev. Stat. §§ 347.010, et seq., and maintains its headquarters in Kansas City, Missouri.

33.  Lockton Partners ultimately holds the operating interests in all Lockton entities that carry on insurance intermediary business on a global basis, including, while Defendants were Producer Members and Producer Partners, the Pacific Series and, currently, the West Series.

34.  A Producer Member becomes a Producer Partner solely by invitation from Lockton Partners for a demonstrated history of exceptional production results and performance as a Producer Member that Lockton Partners determines is likely to continue. The decision to accept the invitation is entirely voluntary; a Producer Member can decline the invitation to become a Producer Partner without any adverse consequences to his or her existing membership interest.

35.  Canales, Barnes, Lawrence, and Roderick became Producer Partners by entering into Partner Agreements and agreeing in writing to be bound by the Lockton Partners Operating Agreement (collectively, with the Pacific Series Operating Agreements, the "Operating Agreements").

36.  Producer Partners, like Barnes, Canales, Lawrence, and Roderick make an initial Capital Contribution (as defined in the Partner Agreement) and thereby acquire a Partner Unit consisting of an equity ownership interest in Lockton Partners.

37.  Producer Partners are entitled to a share of the value of Lockton Partners, denominated in the form of "Class B Shares" that annually are attributed to a Producer Partner's Partner Unit and measure the Producer Partner's share in the value of Lockton Partners as determined by a formula based on global consolidated EBITDA from Lockton's global operations.

16

38.     Producer Partners are also entitled to the opportunity for the value of the Partner Unit to increase significantly over time and thus realize a substantial capital gain from the future sale of the Partner Unit, the "Buy-Sell Price" (as defined in the Lockton Partners Operating Agreement).

39.     Producer Partners are entitled to the opportunity to derive significant tax benefits from their ownership and sale of their Partner Unit in Lockton Partners.

## III.     LOCKTON INSURANCE AGENCY, LLC

40.     LIA was formed under the Missouri Limited Liability Company Act, Mo. Rev. Stat. §§ 347.010, et seq., and maintains its headquarters in Kansas City, Missouri.

41.     LIA is the Corporate Member of each Series.   LIA is the current Corporate Member of the West Series and formerly was the Corporate Member of the Pacific Series.

## IV.     DEFENDANTS

### A.     Alliant

42.     Alliant is a competitor of Lockton that has recently grown its practice through a series of acquisitions and so-called "leveraged hires"—in reality, raids—of producers from competing firms with existing books of business and their teams—many of which have resulted in litigation against Alliant or the producers (indeed, two such cases are pending before this Court).[7]

---

[7] *See, e.g.*, *Marsh & McLennan Agency, LLC v. Alliant Ins. Services, Inc.*, No. 1:24-CV-9914-MKV, 2025 WL 304500 (S.D.N.Y. 2025); *NFP Prop. & Cas. Servs, Inc. v. Alliant Ins. Servs., Inc.*, Case No. 8:24-cv-00789-FWS-JDE (C.D. Ca. 2024); *USI Ins. Servs. LLC v. Alliant Ins. Servs., Inc.*, Case No. 70777/2023 (N.Y. Sup. Court 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, Case No. 3:23-cv-659 (E.D. Va. 2023); *Aon PLC, et al. v. Alliant Insurance Services, Inc., et al.*, Case No. 1:23-cv-03044 (N.D. Ill. 2023); *Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc.*, Case No. 1:22-cv-03931 (N.D. Ill. Jul. 28, 2022); *Aon Risk Servs. Cos. v. Alliant Ins. Servs, et al*, No. 1:21-cv-06870 (N.D. Ill. 2021); *Partners Group, LTD. vs Michael Bonville, et al.*, No. 20CV34115 (Or. Multnomah County Cir. Ct. 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Insurance Services, Inc. et al*, No. 3:21-cv-00417 (W.D.N.C. 2021); *Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc., et al.*, C.A. No. 2184CV2828 (Mass. Sup. Ct. Dec. 10, 2021); *Aon Risk Services Companies, Inc. et al v. Alliant Insurance Services, Inc. et al*, No. 1:19-cv-07312 (N.D. Ill. 2020); *Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc. and Stone Point Capital, LLC*, No. 2020-0780-JTL (Del. Ch. 2020); *Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL (Del. Ch. 2020); *AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564 (E.D.N.Y Nov. 16, 2020); *Arthur J. Gallagher & Co. v. Pierce, et al.*, Cause No. 471-03886-2020 (Tex. Dist.

Through these past transgressions, Alliant is well-aware of the agreements and restrictions that the Individual Defendants agreed to with Lockton.

### B.     The Individual Defendants

43.     By virtue of their longstanding relationships with Lockton, each of the six Individual Defendants has developed business and been personally enriched by Lockton's investments in their careers.

44.     During the Individual Defendants' time at Lockton, the company has invested significantly in client service teams and the resources used by the Individual Defendants to service Customer Accounts.

Cit. Aug. 18, 2020); *Arthur J, Gallagher & Co. v. Tarantino, et al.*, Case No. 3:20-cv-05505 (N.D. Cal. Aug. 7, 2020); *Huntington Bancshares Incorporated v. Burke*, 20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Gallagher Benefit Services, Inc. v. Ghirardi, et al.*, Case No. 50-2020-CA-004646-MB (Fl. Ct. Ct. Apr. 24, 2020); *Assured Partners of Washington, LLC v. Acarregui*, 2:20-cv-00290 (W.D. Wash. Feb. 24, 2020); *Aon Risk Services Co. v. Alliant Ins. Servs., Inc., et al.*, No. 1:19-cv-07312 (N.D. Ill. Nov. 5, 2019); *Arthur J. Gallagher & Co. v. Kuntz, et al.*, Case No. 1—02440 (Pa. Ct. Common Pleas Feb. 8, 2019); *Willis Towers Watson PLC v. Noonan*, No. 1:18-cv-06587 (S.D.N.Y. 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs.*, No. 8:18-cv-01826 (M.D. Fla. 2018); *Corporate Synergies Group, LLC v. Andrews*, No. 2:18-cv-13381 (D.N.J. 2018); *NFP Corp. and Maschino, Hudelson & Associates, L.L.C. v. Alliant Insurance Services, Inc., et al*, No. 2018-0688-AGB (Del. Ch. 2018); *Marsh USA, Inc. v. Moody*, No. 17-651325 (N.Y. Sup. Ct. Aug. 7, 2018); *NFP Corp. v. Ayala*, 2018-0688 (Del. Ch. Sept. 18, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 2018cv308132 (Ga. Super. Ct. July 23, 2018); *Willis of Minn. v. Alliant Ins. Servs., Inc.*, No. 27-cv-18-11684 (Minn. Dist. Ct. July 20, 2018); *Cook Maran & Assocs., Inc., v. Scrocca*, No. C¬209-17 (N.J. Sup. Ct. 2017); *Wells Fargo Ins. Servs. v. Alliant Ins. Servs.*, 2017-0540-JTL (Del Ch. 2017); *USI Ins. Servs. Nat., Inc. v. Grassi, et al.*, 2017-CA-009742-O (Ninth Judi. Cir. For Orange Cty., Fla. Nov. 3, 2017); *Arthur J. Gallagher & Co. v. Long*, No. 1:17-cv-12313 (D. Mass. Dec. 13, 2017); *USI, Inc. v. Call*, No. BC678226 (Cal. Super. Ct. Oct. 2, 2017); *Ralph Weiner & Assocs., LLC v. Hancock*, No. 2017-CH-06618 (Ill. Circ. Ct. May 9, 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Laman*, No. 502016CA009049XXXXMB (Fla. Circ. Ct. April 10, 2017); *Willis of Fla. v. Powell*, No. 2016-CA-007824, 2017 Fla. Cir. LEXIS 6713 (Fla. Cir. Ct. Jan. 25, 2017); *Hays Group, Inc. v. Peters*, No. 16-cv-02352 (D. Minn. 2016); *Aon PLC v. Heffernan*, No. 1:16-cv-1924 (N.D. Ill. 2016); *Willis of Mass. v. Michael G. Feinberg & Alliant Ins. Servs.*, 2016 Mass. Super. LEXIS 1047, 1684CV01497 (Mass. Super. Ct. Oct. 3, 2016); *Smith Bros. Ins. LLC v. Ellenberg-Gray*, No. CV-15-6060903-S (Conn. Super. Ct. Dec. 7, 2015); *Marsh USA Inc. v. Alliant Ins. Servs. Inc.*, No. 15-651994, 26 N.Y.S.3d 725 (N.Y. Sup. Ct. Oct. 19, 2015); *Wells Fargo v. Moreno*, No. 15-25316CA01 (Fla. Cir. Ct. May 11, 2015); *Ascension Ins. Holdings, LLC v. Underwood*, No. 9897-VCG, 2015 WL 356002 (Del. Ch. Jan. 28, 2015); *Willis of Ill. Inc. v. Chapman*, No. 2014-CH-15748 (Ill. Cir. Ct. Nov. 25, 2014); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 14-650700, 2014 WL 2990393 (N.Y. Sup. Ct. June 26, 2014); *Regions Ins. Inc. v. Alliant Ins. Servs.*, No. 3:13-cv-00667 (S.D. Miss. 2013); *Anco Ins. Servs. of Houston v. Barnard*, No. 2011-29054, 2012 WL 2335530 (Tex. Dist. Ct. Feb. 22, 2012); *Aon Risk Servs., N.E. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 20, 2011); *Arthur J. Gallagher Risk Mgmt. Servs. Inc. v. Allen*, No. 08-08922-I (Tex. Dist. Ct. Dec. 16, 2008).

45.     The Individual Defendants had access to important Confidential Information about Lockton's customers, including, without limitation, the customers' insurance needs and preferences, risk appetite, pricing and coverage requirements, present premiums, deductibles, collateral levels, commission arrangements, renewal dates, loss history, levels of satisfaction, and other information that would be greatly beneficial to competitors in soliciting such customers. This information has independent economic value, is not generally available to competitors, and is protected by Lockton as a trade secret.

46.     The Individual Defendants' access to Lockton's trade secrets and other Confidential Information well positions them to subvert Lockton's interests, engage in unfair competition, and convince customers to move business away from Lockton and colleagues to leave Lockton.

47.     Barnes is a commercial insurance brokerage professional and was an owner, Producer Member, and Producer Partner of Lockton. Barnes was also the President of Greater Los Angeles for Lockton and a member of the Executive Committee for the Pacific Series. In those capacities, he was privy to a wide swath of Confidential Information.

48.     At all times during Barnes's association with Lockton, he has been a sophisticated businessman with extensive experience in the business world, including, among other things, years of experience and specialized training in the commercial insurance brokerage industry.

49.     Canales is a commercial insurance brokerage professional and was an owner, Producer Member, and Producer Partner of Lockton.

50.     At all times during Canales's association with Lockton, he has been a sophisticated businessman with extensive experience in the business world, including, among other things, years of experience and specialized training in the commercial insurance brokerage industry.

19

51.     Lawrence is a commercial insurance brokerage professional and was an owner, Producer Member, and Producer Partner of Lockton.

52.     At all times during Lawerence's association with Lockton, he has been a sophisticated businessman with extensive experience in the business world, including, among other things, years of experience and specialized training in the commercial insurance brokerage industry.

53.     McClave is a commercial insurance brokerage professional and was an owner and Producer Member of Lockton.

54.     At all times during McClave's association with Lockton, he has been a sophisticated businessman with extensive experience in the business world, including, among other things, years of experience and specialized training in the commercial insurance brokerage industry.

55.     Racunas is a commercial insurance brokerage professional and was an owner and Producer Member of Lockton.

56.     At all times during Racunas's association with Lockton, he has been a sophisticated businessman with extensive experience in the business world, including, among other things, years of experience and specialized training in the commercial insurance brokerage industry.

57.     Roderick is a commercial insurance brokerage professional and was an owner, Producer Member, and Producer Partner of Lockton.

58.     At all times during Roderick's association with Lockton, he has been a sophisticated businessman with extensive experience in the business world, including, among other things, years of experience and specialized training in the commercial insurance brokerage industry.

### C.    Roderick's Intentional Misrepresentations

59.    On April 20, 2023, at Roderick's invitation, Canales and Roderick played golf together at the Bel Air Country Club.  After the golf outing was over, Canales reported the details of what happened, and of what he and Roderick discussed, to Lockton leadership.

60.    The golf outing that day included drinks and happy hour and, according to Canales, Roderick became intoxicated.

61.    During the outing, Roderick became emotional and revealed to Canales that he was angry that Barnes was elected Producer President of the Los Angeles office and felt he had been slighted.  Roderick believed he should have been Producer President and resented not getting the opportunity.

62.    Following the golf outing, Roderick sent Canales a copy of a lawsuit previously filed yet ultimately dismissed by Barnes, as purported evidence of Barnes's transgressions.

63.    The following Tuesday, April 25, 2023, Roderick asked Canales to meet him for breakfast.

64.    During this breakfast meeting, Roderick informed Canales that he had "had it," intended to join Alliant, and wanted Canales and others to come with him.

65.    Roderick divulged to Canales that he was actively negotiating a lucrative personal deal with Alliant that included a large signing bonus, 25% of any Lockton business that followed him to Alliant, and stock with some liquidity.

66.    Canales purportedly told Roderick he was not interested in going to Alliant.

67.    Following that conversation, Canales told Lockton leadership about Roderick's plans, but asked that it not be revealed to Roderick that he was the person who came forward.

68.    When confronted about his intentions, Roderick adamantly denied that he had any intentions of leaving Lockton to join a competitor and denied he was even speaking to Alliant.

21

69. Over the months that followed, Roderick was directly confronted by Lockton leadership on numerous occasions, and each time he vehemently denied he had any intention of leaving and repeatedly assured Lockton leadership that he had no plans to leave.

70. Despite his professional and ethical obligations, Roderick actively deceived and manipulated Lockton leadership, repeatedly misrepresented his intentions, and intentionally misled the company to pursue his own personal interests. While Roderick continued to lie and mislead Lockton leadership for months, unbeknownst to them he was conspiring with Alliant and the other Individual Defendants to breach their duties to Lockton.

71. On information and belief, Alliant instructed Roderick to keep his agreement to join Alliant a secret, so that Alliant could coordinate with the Individual Defendants and others to plan the "raid" giving rise to this lawsuit. As set forth herein, these surprise raids are a hallmark of Alliant's leveraged hire strategy.

## V. THE INDIVIDUAL DEFENDANTS' AGREEMENTS WITH LOCKTON

### A. The Pacific Series Member Agreement

72. Each of the Individual Defendants is a party to the Pacific Series Member Agreements ("Pacific Series Member Agreement" or "Member Agreement"). These Agreements directly benefitted the Individual Defendants as members and owners of Lockton.[8]

73. Section 4.3 of the Pacific Series Member Agreements explicitly prohibits Producer Members, like the Individual Defendants, from disclosing or misusing the Pacific Series' Confidential Information. In pertinent part, that Section states:

> While Member is a Producer Member of the Series and at all times thereafter, and except with the prior written consent of the applicable Lockton Entity or as is reasonably necessary for Member to perform Member's responsibilities as a Producer Member of the Series, ***Member shall not, directly or indirectly,***

---

[8] The West Series is the successor in interest to all rights held by the Pacific Series under each Pacific Series Member Agreement.

*(a) disclose, or attempt to disclose, Confidential Information to anyone other than the members, officers, or authorized employees, attorneys or other agents and fiduciaries of the applicable Lockton Entity, (b) use, or attempt to use, Confidential Information for any unauthorized purpose, or (c) acquire, access, duplicate, copy, remove, download, upload, save, email, transmit or otherwise take, or attempt to do any of the foregoing with respect to, Confidential Information for any unauthorized purpose.*

74.    Section 4.5 of the Pacific Series Member Agreements explicitly requires Producer Members, like the Individual Defendants, to return the Pacific Series' Confidential Information upon the Pacific Series' request, or upon the sale of the Member's Producer Unit.  In particular, that Section states:

> Member shall, upon the request of any Lockton Entity whose Confidential Information or Property is at issue, or upon the sale of Member's Producer Unit (which occurs on the Buy-Sell Purchase Date), immediately return and surrender to the Series or other applicable Lockton Entity, the Property and the original and all copies of Confidential Information belonging to such Lockton Entity that Member has in Member's possession, custody or control; provided that Member shall be permitted access to the Operating Agreement and shall be permitted to retain one copy of this Agreement. The obligation to return and surrender set forth in this Section 4.5 shall apply to Property and Confidential Information in whatever form, electronic or otherwise, and shall include any electronic device containing any such Confidential Information.

75.    Section 5.3 of the Pacific Series Member Agreements explicitly prohibits Producer Members, like the Individual Defendants, from soliciting Producer Members, Employees, or others who are affiliated with the Pacific Series, both while they are Members in the Pacific Series and for two years following the sale of their Producer Unit.

76.    Section 5.4 of the Pacific Series Member Agreements explicitly prohibits Producer Members, like the Individual Defendants, from soliciting certain Series' customers during their membership with the Pacific Series and for a period of two years after.  In pertinent part, the Pacific Series Member Agreement states:

> *Member shall not, directly or indirectly, for himself or on behalf of any other Person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage any of the Customer Accounts described below, if any*

23

*such Customer Account qualified as a Customer Account within the six (6) month period immediately preceding the sale of Member's Producer Unit, to reduce, terminate, or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by the Series*, the Other Series, or any Affiliate. Member shall not, directly or indirectly, for himself or on behalf of any other Person, (i) accept, service, or work on, or attempt or threaten to accept, service or work on, any such competitive business from any of the Customer Accounts that Member may not solicit, or (ii) in any way do business with any of the Customer Accounts that Member may not solicit to the extent such business is the same or substantially similar to that provided by the Series, the Other Series or any Affiliate. The Customer Accounts to which this restriction applies are:

> (1)    any of the Customer Accounts of the Series (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact; and, . . .

> (2)    any of the Customer Accounts of the Other Series (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact; and, . . .

> (3)    any of the Customer Accounts of any Affiliate (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact.

77.    The Individual Defendants also agreed that Missouri law would govern the Pacific Series Member Agreements, that any related disputes would be resolved in Missouri courts, and that the Individual Defendants would not bring litigation against Lockton anywhere except in Missouri. Specifically, Section 7.7(a) of the Pacific Series Member Agreements provides as follows:

> Member and the Series agree that this Agreement shall be deemed to have been made in the State of Missouri. This Agreement and all disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the Series, including, without limitation, any disputes, claims or issues arising out of the rights and interests of the Other Series, Affiliates and Lockton Entities as set forth

24

herein, shall be ***subject to, governed by, and construed in accordance with the laws of the State of Missouri*** without reference to choice of laws, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. ***Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the Series, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Other Series, Affiliates and Lockton Entities as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri; provided, however, the Series shall pay promptly, upon demand from time-to-time by Member, reasonable out-of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Member hereby agrees to be subject to the personal jurisdiction of such courts. The patties hereto agree that the provisions set forth in this Section 7.7 are fair and reasonable.***

78.     The Individual Defendants seemingly were happy to accept these terms during their membership in Lockton. The Individual Defendants also agreed that the above provisions of the Pacific Series Member Agreements are no greater than necessary to achieve their aim and are reasonably necessary for the protection of the Confidential Information, goodwill, and other legitimate protectable business interests of the Pacific Series, and, as applicable, the Other Series, the Affiliates, and Lockton Entities, whose legitimate protectable business interests include, without limitation, customer contacts and goodwill; relationships with Customer Accounts; maintaining the confidentiality of Confidential Information; and other interests described in Section 5.1 of the Pacific Series Member Agreements. It was only after the Individual Defendants turned their backs on Lockton that they conveniently had an epiphany that the Agreements contained objectionable terms and/or no longer suited their purposes.

79.     The Individual Defendants further agreed that their breach of the above-discussed provisions of the Pacific Series Member Agreements "will result in irreparable harm and continuing damage to the Series" (§ 7.1) and entitles the Pacific Series (or its successor in interest) to injunctive relief. Now, they claim no harm, no foul.

**B.      The Pacific Series Operating Agreements**

80.    **The Individual Defendants agreed to a 30-day notice requirement to ensure a smooth transition in the event of their departure from Lockton.**  The Individual Defendants agreed to the Pacific Series Operating Agreement, and Barnes, Canales, Lawrence, and Roderick agreed to and are also bound by the First Amended and Restated Operating Agreement of Lockton Partners, LLC.

81.    As part owners of Lockton's business, the Individual Defendants agreed and are subject to, among other things, the termination provision contained in the Pacific Series Operating Agreement, which provides the only methods by which a Producer Member can terminate their membership.  The Operating Agreement provides the following voluntary termination provision by members:

Any Producer Member may be terminated as a Member:

(a) by such Series Member on thirty (30) days' written notice to the Series; . . . .

Pacific Series Operating Agreement, § 5.10(a).

82.    The purpose of the 30-day notice requirement is to facilitate a smooth transition of services for the benefit of Lockton (and its clients) upon a Producer Member's or Producer Partner's termination of their ownership interest, by (1) protecting Lockton's Confidential Information, (2) protecting Lockton's relationships with customers, (3) protecting customer information, (4) preventing a corporate raid by a competitor of Lockton to the competitive disadvantage of Lockton; and (5) effectuating the withdrawal or termination of a Producer Member's ownership interest.  Producer Members and Producer Partners also benefit from the 30-day notice period:  during that time they continue to receive distributive draws, producer profit return, and various benefits.

The Individual Defendants also agreed to "devote [their] full time and attention to the

Business of [the Lockton entities]," *see* Pacific Series Operating Agreement § 5.3, and further agreed not to "in any manner, directly or indirectly, participate in, be connected with, have an interest in or aid or assist anyone else in the Business," such as a competitor like Alliant, *see* Pacific Series Operating Agreement § 5.8.

83. Through the Pacific Series Operating Agreement, the Individual Defendants also acknowledge that they are subject to the nondisclosure, non-solicitation, and related obligations contained in the Member Agreements.

### C. The Lockton Partners Partner Agreement

84. **The Individual Defendants agreed to restrictive covenants to protect** ***their*** **interests in Lockton.** Barnes, Canales, Lawrence, and Roderick also agreed to become parties to the Lockton Partners Partner Agreement (the "Partner Agreement"). Section 5.1 of the Partner Agreement contains restrictive covenant provisions, ***incorporated by reference from the Member Agreement***, which prohibit all Producer Partners (including Barnes, Canales, Lawrence, and Roderick) from, among other things, directly or indirectly soliciting or attempting to solicit the associates/employees, members and consultants of the Pacific Series, Other Series, and Affiliates (as defined in the Member Agreement) to terminate their affiliation with the Pacific Series, Other Series and any Affiliate while Barnes, Canales, Lawrence, and Roderick are Producer Partners and for four (4) years after the sale of their Pacific Series Producer Units.

85. **Barnes, Canales, Lawrence, and Roderick agreed to not solicit customers for four years after leaving Lockton**. Barnes, Canales, Lawrence, and Roderick's Partner Agreements also agreed to restrictive covenant provisions. Section 5.1 of the Partner Agreement, ***incorporated by reference from the Member Agreement***, prohibits them from, among other things, directly or indirectly soliciting or attempting to solicit Customer Accounts of the Pacific Series, Other Series and Affiliates (as defined in the Member Agreement) for or on behalf of any

27

competitor, such as Alliant, while they are Producer Partners and for four (4) years after the sale of their Pacific Series Producer Unit.

86. Further, Barnes, Canales, Lawrence, and Roderick are prohibited by the Section 5.1 of the Partner Agreement from directly or indirectly, on behalf of themselves or others, accepting, servicing or doing business with any of the Customer Accounts they are prohibited from soliciting.

87. **Barnes, Canales, Lawrence, and Roderick agreed to not use or disclose Confidential Information after leaving Lockton.** Section 5.1 of the Partner Agreement also contains non-use and non-disclosure provisions, *incorporated by reference from the Member Agreement,* which prohibit Barnes, Canales, Lawrence, and Roderick, while they are Producer Partners and thereafter, from, among other things, disclosing, using or taking for any unauthorized purpose, or failing to return upon demand, any Confidential Information of the Pacific Series and other Lockton Entities (as defined in the Member Agreement), including, but not limited to, information related to Customer Accounts and trade secrets.

88. All Producer Partners agree to these restrictive covenants to prevent a departing Producer Partner from unfairly soliciting Customer Accounts of each respective Series, the Other Series and any Affiliate for the benefit of the joint enterprise of the Producer Partners. The Partner Agreement restrictive covenants both bind and benefit all Producer Partners by protecting the goodwill of their joint enterprise through membership in Lockton Partners and their resulting common equity interests in the appreciation in the value of Lockton's global operations. A departing Producer Partner who successfully solicits Customer Accounts in violation of the Partner Agreement directly harms all remaining Producer Partners by negatively impacting the value of a Producer Partner's Partner Unit and injuring the competitive position and goodwill of Lockton Partners as a whole.

89. For the reasons set forth herein above, these restrictive covenants are essential to the protection of Confidential Information (as defined in the Member Agreements)—specifically information related to Customer Accounts and trade secrets—goodwill, and other protectable business interests. It would cause great and irreparable harm to Plaintiffs to allow Barnes, Canales, Lawrence, and Roderick to act or attempt to act in violation of those restrictive covenants.

90. Barnes, Canales, Lawrence, and Roderick agreed any breach of the covenants incorporated in the Partner Agreement would result in irreparable harm to the Pacific Series, Other Series, Affiliates and other Lockton Entities, and entitles Plaintiffs to the injunctive relief they seek herein.

91. Barnes, Canales, Lawrence, and Roderick further acknowledged the covenants in the Partner Agreement are no greater than reasonably necessary for the protection of the Confidential Information, goodwill and protectable business interests of the Pacific Series, Other Series and Affiliates, and the Confidential Information of the other Lockton Entities, and are reasonable in their scope.

92. To the extent the restrictive covenants incorporated in the Partner Agreement are determined to be unreasonable, Barnes, Canales, Lawrence, and Roderick agreed to request that the Court modify and enforce the restrictive covenants to the fullest extent available under the applicable law.

93. Barnes, Canales, Lawrence, and Roderick have expressly recognized that the Partner Agreement, and the covenants incorporated therein, are supported by adequate consideration.

94.     Barnes, Canales, Lawrence, and Roderick also agreed that to the extent Plaintiffs prevail in a dispute like this related to the Partner Agreement, Plaintiffs are entitled to an award of attorneys' fees in addition to any other remedies available to them.

95.     **Barnes, Canales, Lawrence, and Roderick agreed not to file litigation against Lockton in California.**  Section 5.9 of the Partner Agreement—similar to the other Member Agreements—contains a choice of law clause that states any dispute shall be "governed by" "the laws of the State of Missouri without reference to choice of law" and a forum-selection clause that requires any suit to "be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri."

### D.      The Lockton Partners Operating Agreement

96.     Lockton Producer Partners also become members to the Lockton Partners Operating Agreement.  As relevant here, Section 5.3 states:

> During the Participation Period of a Producer Partner and continuing thereafter through and until such time as the Producer Partner ceases to be a Producer Member in any Series or Affiliate, the Producer Partner shall have a duty of loyalty with respect to the Confidential Information (as such term is defined in a Producer Partner's Producer Member Agreement), Customer Accounts (as such term is defined in a Producer Partner's Producer Member Agreement), goodwill, relationships with Customer Accounts, customer contacts, employees, members, producers and consultants and other legitimate protectable business interests of each Lockton Entity.

97.     Section 5.5 of the Operating Agreement also makes clear that "Nothing in this Agreement or any Partner Agreement shall affect the provisions of the Lockton Companies Operating Agreement or Producer Member Agreement entered into pursuant thereto regarding Customer Accounts and related matters, except as and to the extent provided in such agreements."

## VI.     ALLIANT'S RAID HISTORY AND PATTERN OF TORTIOUS CONDUCT

98. Alliant and Lockton both compete in the market for insurance brokerage and consulting services addressing a variety of industries and risks, including real estate and construction.

99. Lockton has an established reputation as a top global expert and industry leader in the commercial insurance brokerage business, including in California.

100. Beginning in approximately 2015, Alliant devised and began to execute a "leveraged hire strategy" that revolves around taking producers, personnel, and clients from its competitors, including Lockton, through unlawful means. This strategic decision coincided with a large investment from a private equity firm, Stone Point Capital, LLC ("Stone Point"). On information and belief, Stone Point acquired a controlling interest in Alliant in 2015 and has made additional investments in the years that followed. Stone Point holds three of the eight seats on Alliant's Board of Directors. On information and belief, Stone Point developed and helped implement Alliant's "leveraged hire strategy."

101. Alliant decided it would engage in this unlawful strategy for one simple reason: the amount of money, information, and receivables it could steal from its competitors and then turn around and resell to the highest bidder would outweigh the litigation costs, including settlements and judgments, for doing so. Alliant's litigation history and public documents highlight its complete disregard for fair competition and the law. Its raids are calculated and methodical. Each raid follows a basic pattern with minor variations.

102. First, Alliant identifies one or two producers from a competitor who are perceived as important to client relationships and able to generate and move clients. Alliant investigates the size of the "book of business" that the producers manage for the competitor. Alliant then offers the producers significant bonuses and inflated compensation packages—including equity in the

company—to join Alliant. Stone Point's involvement is critical in this respect because, on information and belief, producers are promised that Stone Point will sell Alliant at a large profit in the future, at which point the value of the producers' equity shares in Alliant will skyrocket. These inflated compensation packages are contingent upon the producers violating their contractual obligations and other duties to their current company by soliciting colleagues to join Alliant in coordinated departures, poaching clients, and participating in the other aspects of Alliant's schemes as described herein. Alliant understands that this "leveraged hire strategy" depends upon the violation of fiduciary and contractual obligations owed by producers to Alliant's competitors. Alliant not only encourages and induces these producers to breach their duties, but it also assumes responsibility for those breaches.

103. Then, at Alliant's direction, the producers agree to withhold notice of their decision to join Alliant, commonly in violation of contractual notice requirements.

104. After the producers agree to join Alliant, but while they are still associated with a competitor and withholding notice to that competitor, the producers act as double agents, using the competitor's confidential information and trade secrets for the benefit of Alliant. They operate under the materially false pretense that they remain loyal when in fact they act in Alliant's interests.

105. During the time period between the decision to join Alliant and when they officially resign from an Alliant competitor, the producers secretly gather the competitor's confidential information for Alliant's benefit, including client contacts, renewal dates, premium amounts, loss history, pricing, and other confidential information.

106. During this same window of time—after the producers agree to join Alliant, but while they are still affiliated with an Alliant competitor—the producers help Alliant recruit their colleagues, in violation of common law as well as contractual obligations and duties. Alliant can

32

offer inflated salaries and bonuses to lure away producers and personnel from its competitors in part because the producers often provide Alliant with confidential information about those other team members, in violation of their contractual and fiduciary obligations, and because Stone Point infuses Alliant with the cash necessary to induce and facilitate a massive raid.

107. Then, after months of planning, Alliant and the individuals coordinate with one another to resign their employment abruptly. The coordinated mass resignations at a time when the competitor is unable to immediately respond are Alliant's hallmark, designed to minimize its competitors' opportunity to retain client relationships, while maximizing the benefit of the "raids" to Alliant. A key aspect of Alliant's pattern—which was repeated in this case—is that it often plans the raids at a time when key personnel of its competitor will be at conferences or otherwise occupied, and thus have less ability to respond to Alliant's unlawful coordinated campaigns. *See, e.g.*, *Mt. West Series of Lockton*, 2019 WL 2536104, at *7, *17 (finding Alliant planned the raid for a specific date because "the Mountain Series leadership would be at a company retreat in Arizona that day, which would further interfere with Lockton's ability to respond").

108. Following the mass resignations (and often, even before), Alliant and their newly hired personnel solicit the clients the personnel previously serviced on behalf of the competitors. Alliant often accomplishes this solicitation indirectly, through Alliant personnel other than the newly hired individuals or through newly hired individuals not subject to restrictive covenants, to give the appearance that no contractual obligations are being violated.

109. Finally, and critically, Alliant attempts to conceal its unlawful conduct, even after it is sued. Alliant's extensive concealment efforts came to light in recent litigation between Alliant and Lockton stemming from Alliant's 2019 raid of Lockton's Denver office, in which Alliant poached more than 20 Producer Members and personnel. Lockton sued, and by the date of the

33

preliminary injunction hearing, Alliant had solicited at least 144 Lockton customers, and 50 customers had moved their business to Alliant.[9]

110.     Vice Chancellor Laster of the Delaware Chancery Court issued a comprehensive 57-page opinion finding that Alliant had "engineered" and "coordinate[d]" a sweeping raid against Lockton, induced Lockton personnel to breach their contracts, and initiated a "full-court press" to solicit Lockton's clients.[10]  The Court found, among other things, that Alliant was responsible for "secretive and underhanded behavior in violation of contractual obligations and legal requirements" and for attempting to "mask their activities under a façade of compliance measures and through misleading representations and averments."[11]  The court issued a preliminary injunction enjoining Alliant, along with its affiliated entities, from (i) soliciting or servicing the clients and prospects it targeted in the Lockton raid (including clients that had already been diverted to Alliant); and (ii) soliciting Lockton personnel, members, or consultants to leave Lockton to work at Alliant.

111.     As the Delaware Chancery Court recognized, Alliant's "façade of compliance measures" is a key component to its unlawful strategy.[12]  This façade is premised upon sham protocols and processes, namely a "Prospective Employee Departure Protocol" ("PEDP") and a "remediation program" designed to deceive competitors and to conceal Alliant's unlawful conduct.

112.     The PEDP is designed to deceive competitors by making it appear that Alliant instructed former personnel of competitors to abide by contractual and other obligations to the competitors.  In fact, Alliant's leveraged hire strategy depends on violations of contractual and

---

[9]  *See Mt. West Series of Lockton*, 2019 WL 2536104, at *8.

[10]  *Id.* at *1.

[11]  *Id.* at *22.
[12]  *Id.*

other obligations that are owed to its competitors, and Alliant anticipates, encourages, and rewards the violations, including the use and theft of Alliant's competitors' trade secrets.

113. The sham "remediation program" was designed to conceal the use of confidential information that was stolen from Alliant's competitors for use at Alliant. Through the façade of the "remediation program," Alliant insists that all misappropriated documents have been identified and returned to its competitors or destroyed. In reality, those documents are stolen and utilized by Alliant to solicit clients—thereby damaging competitors by causing loss of revenue—well before the identified documents are purportedly "remediated." And "remediating" a document does nothing when that document and its contents have already been printed, copied, or otherwise disseminated to Alliant personnel. Alliant also uses the façade of the "remediation program" to resist attempts by competitors to discover for themselves what documents were actually taken and utilized by former personnel.

114. Alliant has even directed the destruction of documents and electronic images to conceal unlawful conduct. *See, e.g.*, *Mt. West Series of Lockton*, 2019 WL 2536104, at *20 ("Alliant also took independently wrongful steps such as directing [a departing Producer] to destroy evidence…."). The Court in *Mountain West Series of Lockton* found that "Alliant engaged in extensive efforts to avoid creating an evidentiary record of its activities, which crossed the line on important occasions into the actual destruction of evidence." *See id.* at *17.

115. Alliant's litigation history and the public record demonstrate that Alliant's strategy is designed and implemented with litigation in mind. As one of the Lockton personnel solicited by Arkley in 2019 testified, Arkley told her that "there would be litigation involved" with Alliant's raid, and Alliant "would hope to try to outspend Lockton and hopefully force a settlement." One

of the ways that Alliant attempts to do so is by funding multiple lawsuits in different forums in order to drive up the cost of litigation.

116.    Alliant knows that it is engaging in conduct that will lead to litigation, and that is exactly what has happened for years. Moreover, Alliant understands that it will substantially profit from stealing clients, information, and personnel, which it does without hesitation because the profit generated from its "leveraged hire strategy" covers any litigation costs and allows Alliant to "outspend" its competitors.

117.    Alliant strategically identifies when it wants to raid a competitor, in part because it does not want to afford its competitors time to respond, so Alliant has time to steal the business. Indeed, Alliant intentionally strikes at a strategic time to inflict as much damage as possible upon its competitors, just as it did in this case.

118.    The unlawful scheme described above is the key element of Alliant's growth strategy.[13] Alliant's Chief Operating Officer, Peter Carpenter, directs and manages this unlawful strategy. In its press release announcing Carpenter's promotion to Chief Operating Officer, Alliant stated: "In his new role, Carpenter will be responsible for managing all day-to-day aspects of Alliant's operations and will direct its leveraged hire strategy, which is dedicated to attracting the industry's best and highest performing sales professionals." Stone Point's investment in Alliant is key in that regard. On information and belief, Stone Point's investment allows Alliant to withstand legal challenges so that Alliant can continue to engage in the unlawful conduct described herein.

## VII.    ALLIANT AND THE INDIVIDUAL DEFENDANTS FOLLOW ALLIANT'S ESTABLISHED PATTERN TO INTENTIONALLY HARM LOCKTON

---

[13] *See, e.g.*, *Cusack*, 34 Misc. 3d 1205(A), at *5–6 (describing cost-benefit analysis spreadsheet attached to a memo from Alliant's COO to its Board of Directors in 2011).

119.     Alliant knows that the Lockton agreements require Producer Members and Producer Partners to provide 30 days' written notice of their termination to Lockton and prohibit Producer Members, for a period of at least two years following the sale of their Producer Unit in the applicable Lockton Series, from either directly or indirectly through third parties (i) soliciting, recruiting, or hiring "any employee, member, or consultants"; (ii) soliciting, servicing, or accepting certain Lockton customer accounts; and (iii) disclosing, using, or taking (or attempting to disclose, use, or take) any Confidential Information (as defined in the agreement) for any purpose.

120.     Notably, these non-solicitation and non-disclosure restrictions are essentially identical to the ones that Alliant itself imposes on its employees in order to protect its relationships with customers, employees, and preserve its trade secrets and confidential information.  Indeed, Alliant filed a recent lawsuit in the Southern District of New York seeking to enforce client and employee non-solicitation covenants against a former employee and her new employer. *See Alliant Insurance Services, et al. v. Resilience Insurance Advisory Corp., et al.*, No. 1:23-cv-09277 (S.D.N.Y. filed Oct. 20, 2023). Alliant alleges the former employee engaged in unlawful conduct when she "surreptitiously orchestrated a mass transition" of employees and customers away from Alliant, just as Alliant has done time and time again. Based on the mass solicitation of employees and clients, Alliant alleges that the former employee breached her confidentiality agreements, tortiously interfered with Alliant's business relations, and committed other common law torts and statutory violations.

121.     When Alliant commenced its present attempts to recruit and hire the Individual Defendants, Alliant had full knowledge that they were parties to member agreements with Lockton prohibiting their immediate transition to Alliant and was aware of the restrictive covenants to which they were bound.  On information and belief, Alliant's efforts to solicit and hire the

37

Individual Defendants, and potentially others, to join their ranks are aimed at taking Lockton's customers, trade secrets, and other Confidential Information along with them. It is through this planned scheme, and not through legitimate competition, that Alliant apparently seeks to grow its West Coast insurance brokerage and retirement business and harm Lockton's ability to fairly compete for insurance brokerage and retirement engagements on the West Coast.

122. Alliant's raid in this case followed the precise pattern it has executed in dozens of jurisdictions across the country.

123. First, Alliant and Roderick reached an agreement for Roderick to join Alliant and withhold and misrepresent that fact from Lockton for months while covertly working on behalf of Alliant. On information and belief, Alliant induced Roderick to recruit his colleagues and commit the other tortious conduct described herein by offering him an outsized compensation package, including equity in Alliant.

124. After they were recruited by Roderick and Alliant, the Individual Defendants misappropriated trade secrets and confidential information that belong to Lockton and/or signaled their intention to violate the restrictive covenants they agreed to in their Member Agreements. To take just a few examples, Defendant Barnes sent copies to his personal e-mail address of some of Lockton's most sensitive confidential information under the pretext of needing hard copies because of storms in California—information he had access to only by virtue of his position on Lockton's executive committee—stretching back several months before he departed and then attempted to cover his tracks by deleting those e-mails from his Lockton e-mail account. Defendant Canales e-mailed his entire client list to his daughter's e-mail address in mid-September, under the guise of sending his holiday cards early (the same pretextual subterfuge employed by another former Lockton producer who left Lockton for Alliant last year) and solicited

his Lockton clients for Alliant. And Defendant Roderick instructed his executive assistant to provide him with a printed-out hard copy of his entire client list in the months before he left, after he was already deep into discussions with Alliant and was soliciting other Lockton producers to join him at Alliant; Roderick also stated in a conversation with a Lockton colleague that he believes Alliant will be a better fit for his clients—a clear signal that he has and intends to solicit those clients in violation of his obligations under the Pacific Series Member Agreement and the Lockton Partners Agreement. On information and belief, Alliant and the Individual Defendants already used and are using Lockton's trade-secret and confidential information to unlawfully solicit Lockton's customers—within the first week after the Individual Defendants joined Alliant, multiple of their former customers, representing more than $1 million in revenue, had already moved to Alliant. As of the filing of the First Amended Complaint, more than $4 million in revenue has moved to Alliant. As of the filing of the Second Amended Complaint, total revenue movement has increased to more than $12 million. As of the filing of the Third Amended Complaint, that number increased to more than $20.9 million. As of the filing of this Fourth Amended Complaint, that number continues to grow.

125. Alliant, conspiring with Barnes, Canales, Roderick, and Racunas, used Lockton's Confidential Information to recruit their Lockton colleagues, in direct violation of the obligations under their Member Agreements. On information and belief, they solicited more than twenty Lockton colleagues to join the raid. On information and belief, they acted as double-agents for months, falsely holding themselves out as members of Lockton serving Lockton's best interests while in reality working for and at the direction of Alliant.

126. Alliant and Barnes, Canales, Roderick, and Racunas then, after months of planning, executed the raid at a time and in a manner that would inflict the most harm on Lockton. Beginning

on October 3, 2023, when the Defendants knew key Lockton leadership would be at their annual meetings, they executed their coordinated, mass termination, in breach of their contractual notice obligations:

**The Coordinated Departures**

| No. | Name | Date | Time | Purported Effective Date |
|-----|------|------|------|--------------------------|
| 1 | Barnes | October 3, 2023 | 1:41 pm | "effective immediately" |
| 2 | Racunas | October 3, 2023 | 2:02 pm | "effective immediately" |
| 3 | Roderick | October 3, 2023 | 3:27 pm | "effective immediately" |
| 4 | Canales | October 3, 2023 | Mailed letter to Lockton's GC's desk | "effective immediately" |

127. Along with Barnes, Racunas, Roderick, and Canales, more than a half-dozen individuals with whom they worked closely at Lockton also abruptly resigned from Lockton to join Alliant on the same day. More than a half-dozen other Lockton personnel did the same over the next several days.

128. Simultaneously, and consistent with Alliant's pattern, Barnes, Racunas, Roderick, Canales, and the other Lockton personnel that resigned with them as part of the raid, filed preemptive litigation in California, attempting to rob Lockton of the agreed-to forum in their' agreements. Barnes, Racunas, Roderick, and Canales filed carbon-copy complaints containing the same allegations and seeking the same relief, and all of them are represented by Alliant's longtime outside counsel.[14]

---

[14] While Lawrence and McClave's purported immediate terminations came months later, in April and May 2024, respectively, they followed the same Alliant playbook to violate and interfere with Lockton's membership agreements and is a continuation of the same misconduct orchestrated by the original defendants. On information

129. On information and belief, Alliant and Barnes, Racunas, Canales, and Roderick have engaged in other acts of concealment, consistent with Alliant's pattern, in an effort to cover up their tortious conduct. These concealment efforts will continue throughout the course of this lawsuit.

130. Consistent with Alliant's pattern, Alliant and the Individual Defendants have used the other former Lockton personnel recruited to Alliant as part of the raid to act as "go-betweens" or "strawmen," facilitating the solicitation of Lockton clients while attempting to give the appearance that the Individual Defendants are uninvolved.[15] Alliant has admitted that a dozen former Lockton Associates hired as part of the raid "obtained [the] business" of former Lockton clients for Alliant.

131. For example, on October 4, 2023, a former Lockton Associate spoke to one of the largest Lockton clients serviced by Roderick, and later the same day sent that client a "deliverable regarding Alliant" to facilitate that client's transition of business from Lockton to Alliant.

132. Later in October, another former Lockton Associate sent a presentation titled "the Alliant Story" to a different Lockton client serviced by Roderick. The next day, another former Lockton Associate emailed a Lockton client serviced by Barnes, informing the client he recently joined Alliant and asking for a phone call to "catch up" that week.

133. On October 6, 2023, with the first week of the raid coming to an end, Roderick emailed over a dozen former Lockton personnel recruited to Alliant as part of the raid (as well as Barnes, Canales, Racunas, and Alliant executives Peter Arkley and Michael Cusack). In the email,

---

and belief, Alliant and Lawrence worked together to coordinate Lawrence's resignation with approximately 9 of his Lockton colleagues.

[15] The use of go-betweens is no less a violation of the Individual Defendants' Lockton agreements than direct solicitation, as the Lockton Agreements prohibit the Individual Defendants from soliciting Lockton clients both "directly" and "indirectly."

41

Roderick praised the now-Alliant employees' coordinated effort to unlawfully steal Lockton's business, saying they were "Off to a great start!!" As Roderick's email foretold, the coordinated pilfering of Lockton in early October of 2023 was indeed only the "start." The Defendants' raid continued.

134.    In December of 2023, for example, Canales again enlisted the help of his former Lockton colleagues to solicit a Lockton client. He emailed Roderick, Racunas, and over a half-dozen of his former Lockton (now Alliant) colleagues, informing them that a Lockton client would "be in [Alliant's] office" over the next two days and requesting that they "take the time to introduce [themselves] and befriend [the Lockton client] if the opportunity presents itself." Canales made his intentions clear: "Our hopes are he is an Alliant client by Wednesday." On April 14, 2024, Roderick sent McClave two messages through LinkedIn. Just two days later, on April 16, 2024, an Alliant Director of Business Development in California sought to connect with McClave on LinkedIn, and Roderick again messaged McClave through LinkedIn on April 23, 2024. On information and belief, through these messages and other communications in the spring of 2024, Roderick solicited McClave to leave Lockton and join Alliant.

135.    On May 1, 2024, McClave emailed one of his existing Customer Accounts, asking if they were available to meet up on the following week. That account has since left Lockton to join Alliant. On information and belief, McClave solicited that client to move its business from Lockton to Alliant.

136.    While Lawrence and McClave's departures came after the initial coordinated raid orchestrated by Barnes, Racunas, Canales, Roderick, and Alliant, they followed on their heels within months and immediately began soliciting clients in violation of their Pacific Series Member Agreements, Operating Agreement, and Lawrence's Partner Agreement. Even more, McClave

42

solicited at least two Lockton associates to leave Lockton for Alliant, one of whom did so on the same day as McClave, in violation of McClave's Series Member Agreement and Operating Agreement. Their breaches and misappropriation—like those of Barnes, Racunas, Canales, and Roderick—have, on information and belief, resulted in numerous clients switching their broker of record from Lockton to Alliant.

137.　　Alliant's raid of the Pacific Series forced LIA to provide additional corporate financial support to protect the Pacific Series. As a direct, foreseeable result of Alliant's raid and the Individual Defendants' and Alliant's improper conduct, LIA has been forced to make and will continue to make these payments under compulsion and duress.

## VIII.　IRREPARABLE HARM TO LOCKTON

138.　　The Individual Defendants' abrupt departures from Lockton in contravention of their ownership agreements reflect an unlawful conspiracy: concerted action among numerous Lockton Producer Owners—some of whom indisputably left without returning Lockton property located on their electronic devices, and none of whom have since confirmed that they had actually returned all Lockton information and property—calculated to take place at a time when the executive management would not be readily available to address those departures, and after months of apparent plotting and concealment. The conspiracy continued post-exit, as the Individual Defendants continued to violate their Member Agreements. See Amended and Restated Member Agreement § 4.5 (requiring exiting Member to "immediately return and surrender to the Series . . . the Property and the original and all copies of Confidential Information."). If Defendants are permitted to use Lockton's trade secrets and Confidential Information to compete against Lockton, Lockton will be irreparably harmed.

139. Further, if the Individual Defendants are permitted to violate their obligation to provide the 30 days' notice of termination that Producer Members must provide under their member agreements with Lockton, Lockton will be irreparably harmed.

140. Lockton has expended considerable time, effort, and resources developing and marketing its products and services and cultivating its relationships with Customer Accounts and prospective customers.

141. The Individual Defendants had and have access to valuable Confidential Information and trade secrets concerning Customer Accounts that they are obligated to use solely for the benefit of Lockton or its affiliates.

142. The Individual Defendants notified or attempted to notify Lockton of their intent to immediately terminate as Lockton members on Tuesday, October 3, 2023, with Lawrence and McClave's notices coming months later on April 9, 2024 and May 28, 2024, respectively.

143. With this action, Lockton seeks to enjoin the Individual Defendants from further misappropriation of its valuable relationships with its customers and Confidential Information and to enforce their contractual obligations. Lockton also seeks to recover damages that it has suffered as a result of the unlawful conduct of Defendants and those acting in concert with them.

## COUNT I
## TORTIOUS INTERFERENCE WITH PLAINTIFFS' AGREEMENTS WITH THE INDIVIDUAL DEFENDANTS
### (Against Alliant)

144. Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

145. Lockton and the Individual Defendants entered into their respectively valid contracts for the purpose of establishing and describing the parties' relative rights and obligations with respect to the Individual Defendants' memberships in Lockton and post-membership conduct.

44

146.    Alliant was fully aware of the existence and substance of the valid contracts the Individual Defendants had with Lockton.

147.    Notwithstanding the fact that the Individual Defendants all had entered into binding agreements with Lockton and were compensated handsomely in return, Alliant intentionally induced each individual to breach the terms of their agreements.

148.    Alliant's conduct has damaged Lockton's ability to plan and prepare for this transition and termination of the Individual Defendants' ownership interests, ensure customer service continues uninterrupted, and confirm that the Individual Defendants are not violating any of other agreements to which they agreed.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS (VIOLATIONS OF THE MISSOURI UNIFORM TRADE SECRETS ACT (MO. REV. STAT. § 417.450 *ET SEQ.*) AND DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *ET SEQ.*))**
**(Against Defendants Barnes, Canales, Racunas, Roderick, and Alliant)**

149.    Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

150.    Lockton's Confidential Information, "includes, without limitation, trade secrets, non-public proprietary information, formulas, patterns, compilations, programs, devices, methods, techniques, or processes; sales and other business methods or policies; prices or price formulas; procedures; the identity of and information concerning former or current Customer Accounts of the Pacific Series, the Other Series and/or any Affiliate, including but not limited to Customer Account needs and preferences, levels of satisfaction and the terms of engagement and transactions between the Pacific Series, the Other Series or Affiliates and/or its or his Customer Accounts; revenues, expenses, budgeting, finances and other financial information; computer systems, programs and software . . .; business, marketing and development strategies and plans; the Pacific

45

Series; Other Series and Affiliate member and/or Lockton Entity personnel information, including without limitation, compensation and benefit information; internal operational information related to the structure of any of the Lockton Entities, including without limitation, the Operating Agreement[.]"

151.    Lockton's Confidential Information has actual and potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure or use, and it is subject to efforts by Lockton to keep such information confidential and secret that are reasonable under the circumstances.

152.    For example, Lockton possesses Confidential Information about its Customer Accounts' insurance needs and preferences, risk appetite, pricing and coverage requirements, present premiums, deductibles, collateral levels, commission arrangements, renewal dates, loss history, levels of satisfaction, and other information that would be greatly beneficial to competitors in soliciting such Customer Accounts.  This information has independent economic value, is not generally available to competitors, and is protected by Lockton as a trade secret.

153.    Lockton's Confidential Information constitutes trade secrets and is related to a service used in, or intended for use in, interstate commerce.

154.    Lockton employs reasonable measures to ensure that its Confidential Information remains secret, including by entering into agreements that obligate those with access to ensure that its Confidential Information is protected.

155.    In their capacity as Producer Members and Producer Partners of Lockton, the Individual Defendants have access to Confidential Information from Lockton.

46

156.     Lockton's confidential and proprietary information is given to the Individual Defendants pursuant to express agreements that the secrecy of the information will be maintained and that the information is to be kept confidential.

157.     On information and belief, Roderick, Barnes, Canales, and Racunas knowingly, and with an evil motive or reckless indifference to the rights of Lockton, misappropriated Lockton's Confidential Information in recent months, despite planning to depart Lockton, in order to use such Confidential Information on behalf of Alliant.

158.     On information and belief, Roderick, Barnes, Canales, and Racunas are using, or intend to use, this Confidential Information to solicit business from Lockton's current and prospective Customer Accounts to depart Lockton and join or do business with Alliant, without Lockton's consent.

159.     Roderick's, Barnes's, Canales's, and Racunas's misappropriation of Lockton's Confidential Information has caused and, unless enjoined, will continue to cause damages and irreparable harm to Lockton.

160.     On information and belief, Alliant acquired Lockton's Confidential Information from Roderick, Barnes, Canales, Racunas, and other Lockton personnel hired as part of the raid and is currently using this Confidential Information to solicit business from the Pacific Series'/West Series' current and prospective customers and to solicit the Pacific Series'/West Series' personnel, Producer Members, and Producer Partners to join Alliant.

161.     Alliant knew or had reason to know that Roderick, Barnes, Canales, Racunas, and other Lockton personnel hired as part of the raid acquired Lockton's Confidential Information through improper means—namely, in breach of their agreements and in breach of their fiduciary duties to Lockton.

162.    Alliant knew or had reason to know that its knowledge of this information was derived from Roderick, Barnes, Canales, Racunas, and other Lockton personnel hired as part of the raid, who had acquired this information under circumstances giving rise to a duty to maintain its secrecy.

163.    Alliant used and is continuing to use Lockton's misappropriated Confidential Information without Lockton's consent.

164.    Alliant's misappropriation of Lockton's trade secrets has caused, and unless enjoined, will continue to cause damages and irreparable harm to Lockton.

165.    Alliant's, Barnes's, Racunas's, Roderick's, and Canales's misappropriation of Lockton's trade secrets was willful and malicious, and accordingly they should be ordered to pay Lockton exemplary damages of two times the amount of damages awardable under 18 U.S.C. 1836(b)(3)(B).

**COUNT III**
**BREACH OF CONTRACT**
**(MEMBER AGREEMENTS, PARTNER AGREEMENTS, AND OPERATING AGREEMENTS)**
**(Against the Individual Defendants)**

166.    Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

167.    Lockton and the Individual Defendants entered into their respectively valid contracts for the purpose of establishing and describing the parties' relative rights and obligations with respect to the Individual Defendants' memberships in Lockton and post-membership conduct.

168.    The Agreements were supported by mutual promises and valuable consideration.

169.    Lockton has complied with and performed all obligations under the Agreements, at great benefit to the Individual Defendants.

170. Section 5.10(a) of the Operating Agreements requires Producer Members, as owners, to terminate their membership in Lockton on 30 days' written notice.

171. Under Missouri law, "[a] member [of an LLC] may withdraw from a limited liability company at the time or upon the events specified in writing in the operating agreement, or at any time upon giving ninety days' prior written notice of withdrawal to the other members." Mo. Rev. Stat. § 347.121(1). In addition, a person ceases to be a member of an LLC by operation of Missouri law upon the happening of any one of the events of withdrawal specified in Mo. Rev. Stat. § 347.123.

172. Where an LLC member neither withdraws as a member (under either the applicable operating agreement or Mo. Rev. Stat. § 347.121) nor ceases to be an LLC member upon the happening of one of the events of withdrawal specified in Mo. Rev. Stat. § 347.123, the LLC member remains a member of the LLC.

173. As to each of the Individual Defendants, none of the events of withdrawal specified in Mo. Rev. Stat. § 347.123 has occurred.

174. No provision of the Operating Agreements, Member Agreements, or Partner Agreements, and no provision of Mo. Rev. Stat. § 347.121, allows an LLC member to withdraw from the LLC immediately upon notice. As a result, Individual Defendants were unable to terminate their membership interests in the Lockton entities on the dates of their notices.

175. Under section 5.10(a) of the Operating Agreements, Individual Defendants' notices of termination of their membership interests were effective 30 days after the dates on which they provided those notices. They remained Lockton members and partners, as applicable, and continued to owe fiduciary and contractual duties to Lockton, throughout their time as Lockton members and partners.

49

176.    Section 5.3 of the Operating Agreements requires Lockton producer members to "devote full time and attention to the Business of the" Lockton entity that is a party to the Operating Agreement.

177.    Under Section 5.8 of the Operating Agreements, producer members "agree[] that during the term of [the] Agreement [he] shall [not] in any manner, directly or indirectly, participate in, be connected with, have an interest in or aid or assist anyone else in the Business[.]" The Operating Agreements define "Business" to include "services as an insurance broker and retail insurance intermediary and risk management services, including related insurance brokerage and risk management services, analysis related to various insurance products, acting as an intermediary between clients and insurance carriers by advising clients on risk management requirements, and providing other services related or incidental thereto . . . ."

178.    Section 2 of the Member Agreements and Section 1 of the Partner Agreements incorporate by reference their respective Operating Agreements.

179.    The Member Agreements (i) prohibit the Individual Defendants from disclosing or misusing Lockton's Confidential Information; (ii) prohibit the Individual Defendants from soliciting, or servicing or doing business with, certain Customer Accounts during their membership with the Pacific Series and for a period of two years after; and (iii) require the Individual Defendants to return any Confidential Information immediately upon termination.

180.    The Partner Agreement also prohibits Barnes, Canales, Lawrence, and Roderick, as business owners, from (i) disclosing information about Customer Accounts and disclosing other Confidential Information; (ii) soliciting, or attempting to solicit, directly or indirectly, the Pacific Series' Customer Accounts to move their business; and (iii) accepting or servicing the Pacific Series' Customer Accounts who have moved their business.

50

181. The Individual Defendants have breached and continue to materially breach the express terms of the Operating Agreements and Member Agreements in at least the following ways:

(a) Failing to provide 30 days' written notice of termination of their membership in the Pacific Series;

(b) Failing to devote full time and attention to the Business of Lockton during the 30 days immediately following their purported resignations while they remained producer member and/or producer partners in violation of Section 5.3 of the Operating Agreements.

(c) Alternatively, failing to devote full time and attention to the Business of Lockton during the 90 days immediately following their purported resignations while they remained producer member and/or producer partners in violation of Section 5.3 of the Operating Agreements.

(d) Working for and in furtherance of the business of Alliant during the 30 days immediately following their purported resignations while they remained producer member and/or producer partners in violation of Section 5.8 of the Operating Agreements.

(e) Alternatively, working for and in furtherance of the business of Alliant during the 90 days immediately following their purported resignations while they remained producer member and/or producer partners in violation of Section 5.8 of the Operating Agreements.

(f) Taking Lockton's Confidential Information for use on behalf of Alliant and failing to return that Confidential Information to Lockton;

(g) Filing lawsuits in California state court in violation of the forum-selection clauses in the Member Agreements, Partner Agreements, and Operating Agreements.

(h)     On information and belief, soliciting, or attempting to solicit, directly or indirectly, Customer Accounts to move their business from Lockton to Alliant.

(i)     On information and belief, soliciting, or attempting to solicit, directly or indirectly, Producer Members, Employees, or others who are affiliated with the Pacific Series/West Series to leave Lockton and join Alliant.

(j)     On information and belief, accepting, servicing, working on, doing business with, or attempting to accept, service, work on, or do business with, competitive business from the Customer Accounts that each Individual Defendant may not solicit.

182.    As a direct and proximate result of the Individual Defendants' conduct in material breach of the Agreements, Lockton has suffered and will continue to suffer substantial damage and irreparable harm, or, in the alternative, Individual Defendants are liable for nominal damages.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

183.    Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

184.    As against the Individual Defendants, this Count IV is pleaded in the alternative to the breach-of-contract claim in Count III.

185.    Defendants have wrongfully taken and benefitted from Lockton's business opportunities, Confidential Information, and trade secrets at Lockton's expense.

186.    Permitting Defendants to retain the benefit of the use of these opportunities and valuable information without Lockton's authorization would be inequitable.

187.    Defendants have been unjustly enriched and should pay restitution such that Lockton is returned to the status quo.

188.    The Individual Defendants have further been unjustly enriched in the form of the compensation and benefits provided to them during their employment with Lockton, all of which was conditioned upon their agreement to honor the restrictive covenants set forth in their Agreements.

189.    Lockton is therefore entitled to recover the full amount of these payments from the Individual Defendants, in addition to the above-demanded restitution.

## COUNT V
## BREACH OF FIDUCIARY DUTIES AND/OR DUTIES OF LOYALTY
### (Against the Individual Defendants)

190.    Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

191.    Pursuant to the Agreements, applicable Missouri law, and/or—as applicable—as owners, officers, Producer Members, and Producer Partners of Lockton, the Individual Defendants owe fiduciary duties and/or duties of loyalty to Lockton and have owed such duties at all times that they have been in their respective roles.  Specifically, the Individual Defendants agreed to, among other things, "devote full time and attention to the Business of [Lockton] . . . and do all things as may be reasonably directed by appropriate officers of [Lockton]." Operating Agreements § 5.3.

192.    The Individual Defendants' notices of termination of their membership interests were effective either after 30 days (pursuant to the Operating Agreements) or after 90 days (pursuant to Mo. Rev. Stat. § 347.121(1)) after the dates of those notices, and the remained Lockton members and partners, as applicable, during that time.

193.    The Individual Defendants have breached their fiduciary duties and/or duties of loyalty owed to the Pacific Series in the following manner:

(a)     Failing to provide 30 or 90 days' written notice of termination of membership in the Pacific Series (as applicable) and beginning work at Alliant, a competitor to Lockton, while still members and owners of Lockton;

(k)     On information and belief, taking Lockton's Confidential Information for use on behalf of Alliant and failing to return that Confidential Information;

(l)     On information and belief, soliciting, or attempting to solicit, directly or indirectly, Customer Accounts to move their business from Lockton to Alliant.

194.    As a direct and proximate result of the Individual Defendants' conduct in material breach of their fiduciary duties and/or duties of loyalty owed to Lockton, Lockton has suffered and will continue to suffer substantial damage and irreparable harm.

195.    The Individual Defendants' actions in breach of their fiduciary duties and/or duties of loyalty owed to Lockton and resulting in substantial damage and irreparable harm to Lockton were taken maliciously and were the result of the Individual Defendants' willful misconduct.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Alliant)

196.    Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

197.    Alliant knew that the Individual Defendants' unlawful conduct described above constituted a breach of the Individual Defendants' fiduciary duties owed to Lockton.

198.    Alliant offered substantial assistance and encouraged the Individual Defendants to commit said breaches, and affirmatively acted to aid the Individual Defendants in said breaches.

199.    Alliant associated with the Individual Defendants in bringing about the commission of the unlawful conduct set forth above.

200.     As a direct and proximate result of Alliant's unlawful conduct, Lockton has been injured and seeks all monetary damages recoverable therefrom.

201.     Alliant's conduct is causing irreparable harm to Lockton, for which monetary compensation is insufficient, and for which injunctive relief is the appropriate remedy.

**COUNT VII**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

202.     Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

203.     While the Individual Defendants were still owners, Producer Members, and Producer Partners of Lockton, they agreed with each other, Alliant, and others known and unknown, to further the tortious and unlawful purposes set forth above, including but not limited to collaborating in the Individual Defendants' breaches of contract and fiduciary duties, tortious interference, and theft of trade secrets.

204.     As set forth above, each committed unlawful acts in furtherance of their conspiratorial scheme.

205.     As a direct and proximate result of the Defendants' unlawful and conspiratorial conduct, Lockton has been injured and seeks all monetary damages recoverable therefrom.

206.     Defendants' conspiracy is causing irreparable harm to Lockton, for which monetary compensation is insufficient, and for which injunctive relief is the appropriate remedy.

**COUNT VIII**
**DECLARATORY JUDGMENT**
**(Against the Individual Defendants)**

207.     Lockton incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

55

208.     Given that they have purported to resign "effective immediately," the Individual Defendants have effectively taken the position that they have no continuing obligations to Lockton, do not intend to honor their 30-day notice period, and intend to begin working at Alliant immediately.

209.     Given that they have filed preemptive litigation in California seeking to invalidate numerous provisions in the Pacific Series Member Agreement, the Partner Agreement, and Operating Agreement, the Individual Defendants have effectively taken the position that the forum-selection, choice-of-law, and non-solicitation provisions they agreed to are invalid and unenforceable.

210.     There exists an actual, justiciable controversy between Lockton and the Individual Defendants relating to their legal rights, duties, and obligations under the notice-of-termination, forum-selection, choice-of-law, and non-solicitation provisions of the Agreements that is ripe for adjudication.

211.     Declaratory relief will resolve the legal issues between the parties regarding the enforceability of the notice-of-termination, forum-selection, choice-of-law, and non-solicitation provisions of the Agreements.

212.     Lockton thus requests a judgment declaring the rights and obligations of the parties under the Agreements and that the notice-of-termination, forum-selection, choice-of-law, and non-solicitation provisions contained therein are lawful and enforceable.

## **PRAYER FOR RELIEF**

213.     Wherefore, Lockton prays for an order of this Court:

(a)     Declaring that Individual Defendants have:  (i) breached the Pacific Series Member Agreements, Partner Agreement, and Operating Agreements; (ii) interfered with

Lockton's prospective economic advantage and prospective business relationships; (iii) breached fiduciary duties and/or duties of loyalty; and (iv) misappropriated Lockton's trade secrets;

        (b)     Declaring the rights and obligations of the parties under the Agreements and that the notice-of-termination, forum-selection, choice-of-law, and non-solicitation provisions contained therein are lawful and enforceable;

        (c)     Ordering that Defendants pay to Lockton all damages sustained by Lockton arising from the foregoing misconduct, or, in the alternative, pay Lockton nominal damages;

        (d)     Ordering that Defendants account to Lockton for all gains, profits, and other advantages unjustly obtained by Defendants as a result of their wrongful acts;

        (e)     Ordering that the Individual Defendants account to Lockton for a reasonable royalty for their misappropriation of trade secrets;

        (f)     Ordering that Defendants provide an accounting to Lockton of any and all trade secrets and other confidential and proprietary information that has been used or disclosed to any person or entity;

        (g)     Awarding exemplary damages as authorized by the Missouri Uniform Trade Secrets Act, the Defend Trade Secrets Act, and/or Missouri common law for the willful and malicious misappropriation of Lockton's trade secrets, breaches of fiduciary duty and the duty of loyalty, tortious interference with contract, and conspiracy to do the same;

        (h)     Issuing an injunction: (i) enjoining the Individual Defendants from directly or indirectly: (1) maintaining, possessing, using, disclosing, or providing to any third party Lockton's Confidential Information; (2) using, taking, or disclosing Lockton's Confidential Information and trade secrets to solicit or render services to Customer Accounts, or from wrongfully aiding and/or abetting these activities; (3) violating their fiduciary duties to, and non-

57

solicitation and related obligations and confidentiality agreements with, Lockton; (4) soliciting, inducing, persuading, or encouraging (or attempting to do same) any of the restricted Customer Accounts described in the Member Agreements or Partner Agreements to reduce, terminate, or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by the West Series, Lockton Partners, or any other Lockton Series affiliate, for two years (McClave and Racunas) or four years (Barnes, Canales, Lawrence, and Roderick) after any sale of their Producer Unit; and (5) accepting, servicing, or working on any competitive business from any of the Customer Accounts that the Individual Defendants may not solicit under the Agreements, or in any way doing business with any of the Customer Accounts that the Individual Defendants may not solicit under the Agreements to the extent such business is the same or substantially similar to that provided by the West Series, Lockton Partners, or any other Lockton Series or affiliate, for two years (McClave and Racunas) or four years (Barnes, Canales, Lawrence and Roderick) after any sale of their Producer Unit, as applicable; (ii) ordering that Defendants (1) account for all Lockton's Confidential Information that Defendants misappropriated; (2) return to Lockton all of Lockton's Confidential Information in their possession, custody, and control; (3) certify in writing and under the pains of penalties of perjury, after returning Lockton's Confidential Information, that all paper and electronic copies of all Lockton's Confidential Information in their possession, custody, or control has been returned and, if electronic, upon resolution of these proceedings, has been permanently deleted pursuant to an agreed upon or court-approved forensic protocol from any location where they have been stored; (4) provide an accounting for any products, plans, services, contracts, or other materials that involve or rely on any of Lockton's Confidential Information and for any business obtained by Defendants as a consequence of their unlawful actions; (iii) enjoining Alliant from tortiously

interfering with current and former Lockton producer members' contractual obligations or aiding and abetting their breaches of their fiduciary duties, including the duty of loyalty; and (iv) enjoining Alliant or anyone acting in concert with it or on its behalf from using any Lockton confidential information.

(i)    Award all of the costs and attorneys' fees Lockton has incurred in connection with this action; and

(j)    Award such other and further relief as this Court deems just and proper.

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

By: /s/ *Jennifer L. Berhorst*

Robert J. Hoffman, MO # 44486

Jennifer L. Berhorst, MO # 61784

Dated: May 12, 2025

Bret H.I. Ruber, MO #75078

Grace Colato Martinez, MO # 70921

1200 Main Street, Suite 3800

Kansas City, MO  64105-2122

(816) 374-3200 (telephone)

(816) 3743300 (facsimile)

rjhoffman@bclplaw.com

jennifer.berhorst@bclplaw.com

bret.ruber@bclplaw.com

grace.colato@bclplaw.com

-and-

GIBSON, DUNN & CRUTCHER, LLP

Russel H. Falconer (admitted *pro hac*)

Christine Demana (admitted *pro hac*)

Emily A. Jorgens (admitted *pro hac*)

2001 Ross Avenue, Suite 2100

Dallas, TX 75201

(214) 571-2958 (telephone)

rfalconer@gibsondunn.com

cdemana@gibsondunn.com

ejorgens@gibsondunn.com

Angelique Kaounis (admitted *pro hac*)

2029 Century Park East, Suite 4000

Los Angeles, CA 90067-3026

(310) 552-8546 (telephone)

akaounis@gibsondunn.com

RILEY SAFER HOMES & CANCILA

Eli Litoff (admitted *pro hac*)

One South Dearborn St., Suite 2200

Chicago, IL 60603

(312) 471-8780 (telephone)

elitoff@rshc-law.com

*ATTORNEYS FOR PLAINTIFFS*

60

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 12th day of May 2025, the foregoing document was filed with the Court's CM/ECF electronic filing system, providing notice to all counsel of record.

/s/ *Jennifer L. Berhorst*
Attorney for Plaintiffs